**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**CURTIS A. JOHNSON**                                                                                    **PLAINTIFF**

**v.**                                                   **No. 4:22-cv-00977-KGB**

**PULAKSI COUNTY SPECIAL SCHOOL DISTRICT**                                          **DEFENDANT**

<u>**MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Defendant, Pulaski County Special School District ("District" or "PCSSD"), by its
attorneys, Bequette, Billingsley & Kees, P.A., respectfully submits this Memorandum Brief in
Support of its Motion for Summary Judgment ("Motion") pursuant to Rule 56 of the Federal Rules
of Civil Procedure.  For the reasons discussed herein, the District's Motion should be granted.

<u>**INTRODUCTION**</u>

On May 7, 2021, Plaintiff Curtis Johnson, a black male, filed a charge of discrimination
with the Equal Employment Opportunity Commission ("EEOC").  ECF Doc. 1, at 17.  Johnson
alleged that when PCSSD hired him in 2018, he was paid less than his white predecessor and had
more job responsibilities.  ECF Doc. 1, at 17.  According to Johnson, he was denied the ability to
hire necessary staff and faced retaliation after testifying in PCSSD's long-running desegregation
trial before Judge Price Marhsall (4:82-CV-00866 DPM), which occurred in July 2020.  The EEOC
charge identified several specific instances of discrimination and retaliation in 2020, including
Johnson's being excluded from a facilities tour during the desegregation trial with Judge Marshall
and from monthly meetings. *Id*.  Johnson also claimed that, in March 2021, the chair of the PCSSD
school board ordered him to unlawfully use taxpayer money to settle a loan on a PCSSD football
field, threatening his job responsibilities if he did not comply. Johnson said he refused to do so,

considering the request illegal.  *Id*.  Johnson stated he believed the treatment resulted from his race, gender, age, and retaliation for his testimony, violating his civil rights.  *Id*.

On June 29, 2022, the EEOC issued Johnson a right-to-sue letter.  ECF Doc. 1, at 19.  More than 90 days later, Johnson filed this action against PCSSD in federal court.  ECF Doc. 1, at 1.  On December 20, 2022, PCSSD responded that Johnson's Complaint was filed too late and was therefore barred by the statute of limitations.  ECF Doc. 4, at 4–8.  PCSSD also asserted that Johnson failed to exhaust his administrative remedies before suing under Title VII of the Civil Rights Act of 1964 ("Title VII").  ECF Doc. 4, at 5–6.

The parties have completed discovery pursuant to this Court's scheduling order, and the case is now ready for summary judgment.

## STANDARD OF REVIEW

Any party may move for summary judgment regarding all, or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  This means that "the substantive law will identify which facts are material." *Id*.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*.

An issue of material fact is genuine if it has a real basis in the record.  *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (internal citations and quotations omitted).  An issue of material fact also exists when a reasonable jury could return a verdict for the nonmoving party on the question.  *Woods v. DaimlerChrysler Corp*., 409 F.3d 984, 990 (8th Cir. 2005) (internal citations

2

and quotations omitted). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis Cnty*., 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co*., 517 F.3d 526, 531 (8th Cir. 2008).

A genuine issue of material fact needs enough evidence to support the dispute, thus requiring a jury or judge to resolve the differing versions of the truth at trial. *Anderson*, 477 U.S. at 249. The party moving for entry of summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue. *Celotex*, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show a genuine issue of material fact, meaning that a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

## FACTS

On or about August 8, 2018, PCSSD hired Plaintiff Curtis Johnson as the Executive Director of Operations. Exhibit 1, at p. 1. Upon his hiring, Plaintiff's pay was classified at pay grade 21, with an annual salary of $107,000. *Id*. This pay grade was lower than that of his

predecessor, a white male name Derek Scott, who was paid at pay grade 24, with an annual salary of $137,738.  Exhibit 2, at p. 1.

The decision to adjust the pay grade for the Executive Director of Operations was made by the PCSSD Board on April 18, 2018, almost four months before Plaintiff's hiring, indeed before Plaintiff even applied for the position, and was based on legitimate business considerations. Exhibit 3 (McNulty Affidavit), ¶¶ 5-12.  The position had been vacated by Scott months earlier and remained vacant while PCSSD made decisions regarding the position's pay and responsibilities before position the vacant position.  Exhibit 3 at ¶ 10 and Exhibit 4 (job posting), at p. 1.  Specifically, PCSSD decided that it no longer needed to require the same qualifications for the job role as it had under Scott, who held an engineering degree. *Id*.  The revised job description removed the engineering degree requirement, reflecting the decreased responsibilities of the role following the separation of the Jacksonville North Pulaski School District from PCSSD in 2017, which lowered PCSSD's footprint and operational needs.  Exhibit 3 at ¶ 10 and Exhibit 4, at p. 1–2.

Additionally, the adjustment in pay grade was intended to maintain consistency and fairness in compensation across similar roles within PCSSD—the position would be paid the same as other executive cabinet-level positions.  Exhibit 3 at ¶ 8.  The PCSSD Board sought to ensure internal pay equity among PCSSD's cabinet members.  Exhibit 3 at ¶ 8.

It is important to note that the Board's compensation decisions were made prior to Curtis Johnson applying for the Executive Director of Operations role.  Exhibit 3 at ¶ 10 and Exhibit 5 (board minutes). When the Board voted to change the role in April of 2018, they were not influenced by Plaintiff's race, sex, or age, as Johnson was not even an applicant for the vacant position.  Exhibit 3 at ¶ 10.  The downward compensation adjustments for the Executive Director of Operations position were due to changes in job qualifications (removal of the engineering

4

degree requirement), a redefined scope of responsibilities (fewer buildings to oversee), and the necessity for internal salary alignment.  Exhibit 3.  The application window was open from May 9, 2018, to June 5, 2018, offering an annual salary between $93,452 and $117,364. Exhibit 4, at p. 1.

The bi-racial committee that hired Plaintiff interviewed six candidates for the job.  Plaintiff was one of two finalists, and after an interview, the committee unanimously recommended him for the job.  Exhibit 6 (committee recommendations).  Plaintiff, who is still working for PCSSD to this day, has consistently received pay raises and now earns more than Derek Scott did when he left the District's employment in 2017.  Exhibit 16 (Plaintiff's back pay history).  A breakdown of Plaintiff's compensation is as follows:

- **2018-2019:** When Plaintiff was hired, his daily rate was $491.00, leading to an annual salary of around $107,038.

- **2019-2020**: Plaintiff got his first raise on July 1, 2019, boosting his daily rate to $533.00 and increasing his annual salary to approximately $130,052.

- **2020-2021**: Plaintiff's salary was increased again on July 1, 2020, with his daily rate adjusting to $541.00, equating to an annual salary of approximately $132,004.

- **2021-2022**: On July 1, 2021, Plaintiff's salary remained the same, with a daily rate of $541.00 and an annual salary of approximately $132,004.

- **2022-2023:** As of July 1, 2022, Plaintiff's daily rate rose to $562.64, resulting in an annual salary of about $137,284.

- **2023-2024**: On July 1, 2023, Plaintiff's daily rate was increased to $595.89, resulting in an annual salary of approximately $145,397.

- **2024-2025:** For the current school year, effective July 1, 2024, Plaintiff's daily rate is $595.89, with the annual salary remaining constant, projected to be approximately $145,397.

Exhibit 1 (Plaintiff's contracts), pp. 1–9; Exhibit 16.  It is standard procedure for the Executive Director of Operations to take on any unfilled Director positions until permanent replacements are appointed.  Exhibit 3.  This practice was followed for Derek Scott and is currently in effect for Plaintiff.  Exhibit 3.

In July 2020, Plaintiff testified during the three-week desegregation trial to determine if PCSSD was now unitary under its long-running desegregation obligations. Exhibit 11. Plaintiff testified as to PCSSD facilities and Judge Marshall found his testimony at trial "helpful and credible" regarding the facilities. Exhibit 11, at p. 28. Specifically, Plaintiff testified that the Robinson Middle School was "superior" to the one at Mills High School. Exhibit 11, at p. 29. Judge Marshall found PCSSD unitary on all issues aside from directives to "shore up" issue with Mill High School. *Little Rock School District v. Pulaski County Special School District, et. al*., 4:82-CV-00866-DPM (ECF Doc. No. 5730).

As part of the desegregation trial in the summer of 2020, a facilities tour was conducted by Judge Marshall under strict COVID-19 precautions. Exhibit 10. Due to the pandemic, the District was permitted to have only one representative participate in the tour, which was the Court's personal view of the facilities that had been discussed in the desegregation trial. *Id*. Dr. Linda Remele, the President of the PCSSD Board, was selected as its sole representative for the tour. Exhibit 3. The decision to choose Dr. Remele was based on the extremely limited number of participants allowed under the COVID-19 restrictions and the necessity of having a senior leader with a comprehensive understanding of the Board's perspective, viewpoints, and decisions on site during the tour. *Id*. Plaintiff was not selected for this role. *Id*. This decision did not impede Plaintiff's ability to perform his job duties. Exhibit 3.

As part of PCSSD's desegregation obligations, it had meetings, and often. Plaintiff alleges he was excluded from some of these meetings. ECF Doc. 1, at 49. In January 2021, Plaintiff exchanged text messages regarding monthly desegregation meetings ordered by the judge. Exhibit 12, at p. 4. Plaintiff acknowledged that, at Superintendent McNulty's request, he would not be attending future meetings. Exhibit 12, at p. 3.

In 2021, members of the PCSSD Board started discussing the purchase of assets and capital improvements to PCSSD athletic facilities at Sylvan Hills High School in excess of $1,000,000, which were previously undertaken by a non-profit foundation supporting PCSSD in accordance with standard procurement processes, using donations and a loan obtained from a local bank. Exhibit 13.  The nonprofit foundation secured the loan for the capital improvements to PCSSD property while PCSSD was under state control through the Arkansas Department of Education and without a locally elected school board, and the capital improvements were owed by the nonprofit foundation but used exclusively by PCSSD.  Exhibit 14.  The nonprofit foundation had paid down the loan, but still owed approximately $700,000, and PCSSD stakeholders felt it appropriate for PCSSD to purchase the assets and improvements from the foundation for the remaining balance of the loan.  According to Johnson's Complaint, Plaintiff took the position that since PCSSD did not take out the loan, and had no part in obtaining the loan, it would be illegal for PCSSD to assume the loan.  ECF Doc. 1, at ¶ 57.

PCSSD sought legal advice on this issue.  On August 4, 2021, PCSSD received a legal opinion from Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C., confirming that it was lawful for PCSSD to purchase the assets and capital improvements to the Sylvan Hills Athletic facilities, in part because the improvements benefited PCSSD and were done in accordance with standard procurement procedures and with the knowledge of Sylvan Hills High School officials. Exhibit 14.  Following legal advice, the PCSSD Board approved payment of $700,000 to the nonprofit foundation for the balance of the loan outstanding on August 10, 2021.  Exhibit 15, Bates No. 232. The Board's discussion and approval of the payment to the nonprofit foundation to purchase the assets was an administrative matter and had no impact on Plaintiff's job or any employment practice within PCSSD.  Exhibit 13.

**ARGUMENT**

**I.      PCSSD Is Entitled to Summary Judgment on Plaintiff's Race Discrimination and Retaliation Claims under Title VII as a Matter of Law.**

Title VII prohibits discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition, Title VII "prevents employers from retaliating against employees who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace." *Brannum v. Mo. Dep't of Corr.*, 518 F.3d 542, 547 (8th Cir. 2008); 42 U.S.C. § 2000e-3(a).

Here, Plaintiff brings two Title VII claims—one for racial discrimination and one for retaliation. ECF Doc. 1, at 10–11, ¶¶ 63–72. It is important to note that Plaintiff has never revised his pleadings. At this stage in the proceedings, it is too late to make amendments without a strong showing of good cause and the Court's consent, which Plaintiff has not secured. *See* Fed. R. Civ. P. 16(b); *Sherman v. Winco Fireworks*, Inc., 532 F.3d 709 (8th Cir. 2008).

In his Complaint, Plaintiff asserts: (1) he was subjected to less favorable terms and conditions of his employment when he was paid less than his white predecessor; and (2) he was denied the support staff needed for him to perform his duties as the Executive Director of Operations. ECF Doc. 1, at 10–11, ¶¶ 63–66. Plaintiff also claims that, in retaliation for opposing discriminatory treatment and participating in protected activities, court testimony, he was demoted, excluded from important meetings, received lower performance evaluations, and faced "unwarranted hostility" from board members and the superintendent. ECF Doc.1, at 11, ¶¶ 68–72.

A.    **Plaintiff's Claims Are Time-Barred Because He Failed to File His Lawsuit within the Statute of Limitations and Did Not Plead Equitable Tolling in His Complaint.**

Title VII of the Civil Rights Act of 1964 requires that a plaintiff commence a civil action within 90 days after the EEOC notifies the individuals of their right to sue.  42 U.S.C. § 2000e-5(f)(1).  The 90-day limitation period is strictly construed.  It begins to run on the date that the EEOC right-to-sue letter is received.  *Hill v. John Chezik Imps*., 869 F.2d 1122, 1124 (8th Cir. 1989).  When the date or receipt of the right-to-sue letter is unknown or disputed, the law presumes that it is received three days after mailing, consistent with Rule 6 of the Federal Rules of Civil Procedure.  *See, e.g.*, *Gaither v. Ark. Found. for Med. Care*, No. 4:11-cv-00576-KGB, 2013 U.S. Dist. LEXIS 117886, at *31 (E.D. Ark. Aug. 20, 2013) (citing *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 n.1 (1984)).  The EEOC may give—and the employee may receive— a right-to-sue letter through email, the Public Portal, or through notice to his or her lawyer.  *McDonald v. St. Louis Univ*., 109 F.4th1068 (8th Cir. 2024).  An EEOC decision that is transmitted to a complainant through the Public Portal or by email shall be deemed to be received when the decision is accessed on the Portal or when received if transmitted via email, or within five days of when the decision is uploaded to the Portal or emailed, whichever occurs first.  29 C.F.R. § 1614.604(d).  The "clock" starts when the notice is received, which can include an email notification with a link to the document, whether the document was opened or read at that time.  *McDonald*, 109 F.4th1068.

Courts have generally reserved the remedy of equitable tolling for circumstances that are "truly beyond the control of the plaintiff."  *Hill v. John Chezik Imports*, 869 F.2d 1122, 1124 (8th Cir. 1989).  A lack of diligence does not justify tolling the mandatory 90-day filing deadline.  *McDonald*, 109 F.4th 1068.  A court may not extend this mandatory deadline absent extraordinary circumstances.  *See id*.

Tyrone Blanks, an EEOC Investigator, sent an email to Plaintiff at 10:50 a.m. on Wednesday, June 29, 2022, which included a Letter of Determination.  Exhibit 7.  The recipient email address that was identified and sent to Plaintiff matched the one he used to electronically sign his Charge.  Exhibits 7–8; ECF Doc. 1, at 17.  Plaintiff's right-to-sue letter was also issued by the EEOC that same day—June 29, 2022.  ECF Doc. 1, at 19.  The letter clearly states:

> Receipt generally occurs on the date that you (or your representative) view this document.  *You should keep a record of the date you received this notice*.  Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days.

ECF Doc. 1, at 19 (emphasis added).

Nevertheless, Plaintiff's Complaint does not specify the exact date on which the right-to-sue letter was received, only mentioning that it arrived "sometime after July 14, 2022."  ECF Doc. 1, at 14, fn. 5.  Even if Plaintiff had extra time to file his Complaint—three days for mail or five days for email or Public Portal—it is still late.  If Plaintiff received the letter five days after it was issued, which the law presumes, he was required to file his lawsuit by October 3, 2022.  However, Plaintiff did not file this lawsuit until October 7, 2022.  ECF Doc. 1.  Plaintiff has provided no reason, equitable or otherwise, as to why he filed this action outside the 90-day period.  Indeed, Plaintiff cannot use equitable tolling to save his Title VII claims because he failed to plead any facts in his Complaint to support an application of the doctrine.  *See, e.g., Dugger v. Store*, 2022 WL 17471376, at *2 (E.D. Mo. Dec. 6, 2022).  There is no factual basis to apply equitable tolling in this case.  In the absence of tolling, Plaintiff's Title VII claims fail as a matter of law.

Because Plaintiff did not meet the 90-day statute of limitations required by Title VII and did not plead equitable tolling, his discrimination and retaliation claims are barred as a matter of law and must be dismissed with prejudice.  The District is entitled to judgment as a matter of law.

**B.     Plaintiff's Title VII Claims Should Be Dismissed for Failure to Exhaust Administrative Remedies.**

Timely filing an EEOC charge is a statutory prerequisite to filing a complaint alleging violations of Title VII.  Plaintiffs must exhaust their administrative remedies before suing an employer in federal court under Title VII of the Civil Rights Act of 1964.  42 U.S.C. § 2000e-5(e).  An administrative charge serves an important purpose: "The reason for requiring the pursuit of administrative remedies first is to provide the [EEOC] with an initial opportunity to investigate allegations of employment discrimination and to work with the parties toward voluntary compliance and conciliation." *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005).

**1.     Plaintiff's Disparate Treatment and Retaliation Claims Are Barred by His Failure to Exhaust Administrative Remedies.**

The law requires that Plaintiff file a charge with the EEOC within 180 calendar days after the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(e).  If a plaintiff fails to timely file an EEOC charge, his Title VII claim fails as a matter of law.  *See Kline v. City of Kansas City, Fire Dept.*, 175 F.3d 660, 664 (8th Cir. 1999).  For timeliness, if the discrimination or retaliation is a discrete act, it is considered to have occurred on the date the act took place.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  Claims based on acts outside the 180-day window are time-barred, even if related to timely EEOC charge allegations. *Morgan*, 536 U.S. at 113.  For discrete acts that occur after the EEOC charge is filed, the plaintiff must submit a new charge to the EEOC for those actions to be pursued in federal court.  *See, e.g., Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 919–21 (8th Cir. 2018).  Each discrete act triggers a new deadline for filing EEOC charges.  *Id*

In this case, Plaintiff filed his EEOC charge on May 7, 2021.  ECF Doc. 1, at 17.  Accordingly, his discrimination and retaliation claims are limited to events occurring within 180 days prior to the filing of the charge.  All this means that any alleged discriminatory or retaliatory

11

acts occurring before November 8, 2020, are time-barred. *Morgan*, 536 U.S. at 110. Plaintiff has not filed any new charges with the EEOC during this lawsuit, which means that any separate events occurring after May 7, 2021, are not actionable. *Moses*, 894 F.3d at 919–21. Therefore, this Court can only consider the events occurring between November 8, 2020, and May 7, 2021, when evaluating the timeliness of Plaintiff's Title VII claims.

Here, crux of the Complaint is Plaintiff was not compensated equally to Derek Scott, a white male predecessor previously in the same role with PCSSD. Plaintiff asserts that this discrimination occurred in 2018 when he was hired by PCSSD. Specifically, Plaintiff stated in the EEOC charge, "I was hired on or about August 8, 2018, as Executive Director of Operations. I was paid less than my white predecessor with more responsibility." ECF Doc. 1, at 17. The initial decision to set Plaintiff's salary at a lower rate than Scott's salary was a decision occurring at a specific point in time. By his own account, this decision was made on or about Plaintiff's hire date on August 8, 2018. Plaintiff was required to challenge this discrete act within 180 days, which would mean filing the EEOC charge on or before February 4, 2019. Plaintiff failed to do so. Therefore, his discrimination claim is time-barred under *Morgan*.

Plaintiff also alleged to the EEOC that in 2018 he "was not allowed to hire the necessary management staff compared to [his] white predecessor." The denial of the ability to hire necessary management staff at the time of Plaintiff's hiring is a discrete act. Plaintiff was required to complain to the EEOC within 180 days of the act to be able to bring a federal lawsuit under Title VII for this discrimination claim. Plaintiff's claim is barred because he has failed to file a timely charge related to this event.

Plaintiff's retaliation claim based on his testimony in the school desegregation trial is also time-barred. The trial testimony took place in July 2020. ECF Doc. 1, at 16. Any alleged retaliatory action by the District in response to this act would need to have occurred within 180

days of Plaintiff filing his EEOC charge, which was on May 7, 2021.  However, Plaintiff has not identified any specific retaliatory actions that occurred between November 8, 2020, and May 7, 2021, and did not file an EEOC charge within 180 days of his July 14–31, 2020, trial testimony.

Plaintiff's Charge specifically claimed that he was wrongfully excluded from a "federal judge tour" of the PCSSD's facilities on or about August 1, 2020.  ECF Doc. 1, at 16.   Any discrimination or retaliation claim arising from the "federal judge tour" is procedurally barred because a decision to exclude Plaintiff from participating in the tour is a discrete act—a specific, one-time decision made in a particular moment.  Consequently, Plaintiff was required to file a timely EEOC charge by January 28, 2021, which is 180 days from the alleged retaliatory or discriminatory event, and he did not do so.  Instead, Plaintiff did not file his operative EEOC charge until May 7, 2021.  Consequently, any claim arising from the federal judge tour is time-barred.

The foregoing events took place outside the actionable November 8, 2020, to May 7, 2021, window.  The Court must dismiss any claims arising before November 8, 2020, as a matter of law. These claims are time-barred under *Morgan*.

### 2. *Plaintiff's Claims Based on a Hostile Work Environment Are Also Barred.*

To the extent Plaintiff's Complaint makes one or more claims based on a hostile work environment, those claims have not been properly exhausted.  When determining the timeliness of a claim for a hostile work environment, the claim can occur over time but only if all acts which constitute the claim are part of the same unlawful employment practice *and* at least one act falls within the period.  *Morgan*, 536 U.S. at 122.  To benefit from the extended limitations period, the plaintiff must have alleged the continuing violation theory in the original EEOC charge.  *Id*.

Plaintiff alleged that following his testimony in a desegregation trial related to school facilities held from July 14 to 31, 2020, he began experiencing a hostile work environment.

Specifically, he told the EEOC, "After my testimony, I started to experience retaliation in the form of exclusion, harassment, and hostile work environment, which is preventing me from completing my job duties."  ECF Doc. 1, at 16.  But Plaintiff did not allege a continuing violation theory in his original EEOC charge.  Nor did he show that any of the acts occurring within the statutory period covered by the EEOC charge—November 8, 2020, to May 7, 2021— are part of a single, continuous pattern of harassment or retaliation that began after his trial testimony.  Critically, Plaintiff has not clearly connected the earlier act of testifying during a July 2020 trial to any discriminatory or retaliatory acts within the statutory period.  Consequently, any claims related to a hostile work environment are procedurally barred for failure to exhaust administrative remedies. *Morgan*, *supra*.

To summarize, Plaintiff's Complaint is untimely, and even if had been timely filed, he has not exhausted his administrative remedies, requiring dismissal of his claims as a matter of law. For the following reasons, Plaintiff cannot establish his Title VII claims as a matter of law because there is no evidence that PCSSD retaliated or discriminated against Plaintiff.

### C.    Plaintiff Cannot Establish a *Prima Facie* Case of Racial Discrimination.

To establish a prima facie case of race discrimination under Title VII, a plaintiff must demonstrate that he (1) belongs to a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was treated differently from similarly situated employees outside his protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Here, Plaintiff cannot meet this burden.

First, Plaintiff has failed to identify a similarly situated comparator who was treated more favorably. To establish disparate treatment and satisfy the comparator element, a plaintiff must show that his or her circumstances are nearly identical to those circumstances of a better-paid employee who is not a member of the protected class.  *Fields v. Shelter Mut. Ins. Co*., 520 F.3d

859, 864 (8th Cir. 2008).  The test is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing himself to the other employees.  *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001).

Plaintiff failed to produce evidence that PCSSD treated similarly situated individuals differently.  During his deposition testimony, Plaintiff admitted that he was not an engineer and admitted that his predecessor Derek Scott was.  Exhibit 9.  This is a critical reason why Plaintiff was not similarly situated to Scott in all relevant respects.  Plaintiff also had less facilities to manage than Scott did.  Exhibit 9.

Plaintiff's comparison to Scott is also inadequate because the Executive Director of Operations role responsibilities were reduced and realigned in April 2018 before Plaintiff was hired, reflecting legitimate non-discriminatory reasons unrelated to Plaintiff's race. The Board's decision to lower the pay range before the position was posted in May 2018 shows that Plaintiff's pay was not a result of racial discrimination when he was hired in August 2018. Consequently, Plaintiff cannot establish causation or disparate treatment.

He also cannot establish adverse employment action for the following reasons.  Plaintiff's allegations—his exclusion from the desegregation tour and meetings and not having his department fully staffed—do not rise to the level of adverse employment actions as required to sustain a Title VII claim.  An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge. *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs*., 728 F.3d 800, 804 (8th Cir. 2013).  This definition does not include "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage . . . ." *Id*.

15

The record shows that PCSSD took no adverse employment action against Plaintiff. Nothing Plaintiff alleged resulted in a significant change in employment status, pay, or benefits. Plaintiff cannot show that missing a tour, being excluded from some meetings, and having to fill in for some unfilled staff positions are discriminatory acts based on his race. Plaintiff has not presented any proof that received lower evaluations or that these evaluations qualify as an adverse employment action under Title VII. Most importantly, Plaintiff was not demoted in title, nor did he suffer a reduction in pay or benefits. In fact, Plaintiff received salary increases during the time he alleged that PCSSD discriminated or retaliated against him. Both Plaintiff and his predecessor Derek Scott had to adapt to the dynamic nature of unfilled roles and positions within PCSSD to accomplish their jobs effectively. Exhibit 3. Yet Plaintiff's pay has consistently increased, culminating in a pay range and salary exceeding his predecessor's. *See* Exhibit 16. For these reasons, Plaintiff's claims should be dismissed.

### D.   Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.

Title VII "prevents employers from retaliating against employees who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace." *Brannum v. Mo. Dep't of Corr.*, 518 F.3d 542, 547 (8th Cir. 2008); *see* 42 U.S.C. § 2000e-3(a). To establish retaliation, a plaintiff must prove (1) he engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that the engagement in a protected activity is the but-for cause of the adverse employment action. *Warren v. Kemp*, 79 F.4th 967, 973 (8th Cir. 2023).

Plaintiff alleges that after he provided testimony in federal court regarding a disparity in the construction of new school facilities that he was: (a) not permitted to participate in the court-ordered tour of the facilities under construction; (b) excluded from monthly meetings; (c) his proposed budget items for facilities upgrades were rejected; (d) suffered lower performance

evaluations and "hostility" from the superintendent and board members.  Plaintiff also said that PCSSD pressured him to have the District assume a loan that he believed was unlawful.  When he refused, he said that Dr. Remele threatened to block his construction projects from consideration by the full board.

None of these bald assertions are sufficiently established to survive summary judgment.  In *Warren v. Kemp*, 79 F.4th 967 (8th Cir. 2023), the Eighth Circuit most recently clarified what constitutes an employment practice for purposes of Title VII.  *Warren v. Kemp* involved PCSSD and a PCSSD administrator, Janice Warren, who sued under Title VII and alleged, among other claims, retaliation.  Warren alleged that she brought issues with PCSSD's compliance with its desegregation obligations to the school board's attention, and claims it led to her not being chosen for the full-time superintendent's position.  Warren was the PCSSD interim superintendent in 2017 when she alleged she brought to the school board's attention disparities with PCSSD facilities at the predominantly white Robinson Middle School and the predominantly black Mills High School, which angered the board and led to her not being selected for the full-time superintendent position.  Notably, these issues were at the center of the facilities portion of the desegregation case tried before Judge Marshall in the summer of 2020, the same trial where Johnson testified and now claims his testimony led to retaliation by PCSSD against him.

In *Warren*, the Eighth Circuit held that opposition to practices that do not directly relate to the terms, conditions, or privileges of employment are not protected under Title VII, which included Warren bringing disparities in facilities to the board's attention.  To qualify as a protected activity under Title VII, an employee's actions must directly involve an employment practice.  *Id.*  The court reasoned that Warren's reporting of the disparities between the facilities at Mills High School, in a predominately black area, and Robinson Middle School, in a predominately white

area, did not affect the terms, conditions, or privileges of Warren's employment or that of other employees. *Warren*, 79 F.4th at 974.

The same core legal principle applies in this case. Plaintiff's testimony in the desegregation trial about PCSSD facilities did not involve an employment practice, and he was merely doing his job as facilities director by testifying in court. Because the action that Plaintiff argues is protected—testifying in court about the disparities in school facilities——is not related to the terms, conditions, or privileges of his employment with the District, it is not protected under Title VII. *Warren*, 79 F.4th at 974. "[S]imply performing one's job duties is not itself a protected activity." *Id*.

Neither did Plaintiff engage in a protected activity when he expressed opposition to PCSSD's purchase of athletic facilities improvements at Sylvan Hills High School for the purchase price remaining on an outstanding loan with the non-profit foundation. Plaintiff is not a lawyer, and the repayment of a loan is not an employment practice. As explained in detail above, there was no loan repayment made by PCSSD, but instead PCSSD purchased the capital improvements to its property that was owned by a nonprofit foundation supporting PCSSD. The purchase of the capital improvements was a financial decision made by the PCSSD Board after seeking legal advice. Plaintiff's opposition to this decision (which he has not even established as a factual truth, but only a claim in his lawsuit) does not fall within the scope of Title VII.

Furthermore, even if Plaintiff could establish that he engaged in protected activity (he did not), he did not suffer an adverse employment action. The Eighth Circuit has consistently held that "minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Wilkie v. Dep't of Health & Human Services*, 638 F.3d 944, 955 (8th Cir. 2011). Simply being unhappy with employment changes does not suffice to meet this standard. *Dick v. Dickinson*

*State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016). Additionally, "petty slights and minor annoyances in the workplace, as well as personality conflicts and snubs by co-workers, are not actionable." *Sutherland v. Missouri Dep't of Corrections*, 580 F.3d 748, 752 (8th Cir. 2009). Plaintiff's exclusion from specific meetings, change in some job duties, and rejection of budget proposals, represent, at most, minor changes in his working conditions. The type of "hostility" Plaintiff is claiming falls into the category of "petty slights and minor annoyances" that are not actionable. Plaintiff has not demonstrated a tangible employment action that materially affected his job like demotion, a reduction in pay, or a significant alternation in his job duties.

Lastly, there is a lack of causal connection. The timeline of events does not support an inference of retaliation. Plaintiff's retaliation claims, which are largely based on his testimony in a desegregation case in July 2020 and refusal to engage in what he perceived to be unlawful conduct in March 2021, fail because there is no evidence of a causal connection between these activities and any adverse employment action. The retaliatory acts that Plaintiff alleges occurred long after the protected activities. Plaintiff has not submitted any further EEOC Charges since the initial filing that would indicate any further or continuing acts of retaliation against him. The actions taken by PCSSD in this case were based on legitimate, nonretaliatory reasons and were unrelated to any protected activity.

To the extent Plaintiff makes a separate claim for a hostile work environment, that claim, too, fails as a matter of law. A hostile work environment requires the occurrence of unwelcome harassment, that the harassment affected a term, condition, or privilege of employment, and that the harassment was severe and pervasive, both objectively and subjectively. *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002). Harassment is conduct—words and actions that an employee finds unwelcome, which is "so intimidating, offensive, or hostile that it poisoned the work environment." *Carpenter v. Con-Way Cent. Express*, Inc., 481 F.3d 611, 618 (8th Cir. 2007).

Factors to consider when determining the severity and pervasiveness of an employer's conduct include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance. *Duncan*, 300 F.3d at 934.  None of the facts Plaintiff asserts meet this standard. Interpersonal conflict is not enough to establish a hostile work environment.

For all the foregoing reasons, this Court should grant summary judgment on Plaintiff's Title VII claims.

## II.   The District Is Entitled to Summary Judgment on Plaintiff's Arkansas Whistleblower Claim.

Under the Arkansas Whistle-Blower Act ("AWBA"), a public employee who reports violations of law or waste of public funds to the appropriate authorities is afforded protection under the Act.  *See* Ark. Code Ann. § 21-1-602(8).  A public employer is prohibited from taking adverse action against a public employee for a communication that falls within the protection of this subchapter. *See* Ark. Code Ann. § 21-1-603(a)(1).  A public school district is a "public employer" within the meaning of the Act. Ark. Code Ann. § 21-1-602(5)(E); *Hollis v. Fayetteville Sch. Dist. No. 1*, 2015 Ark. App. 544, at 13–14, 473 S.W.3d 45, 51–52.  Pursuant to section 21-1-602(1), an "adverse action" means to discharge, threaten, or otherwise discriminate or retaliate against a public employee in any manner that affects the employee's employment, including compensation. A whistle blower who is punished by a public employer may seek actual damages and injunctive relief.  *See* Ark. Code Ann. § 21-1-604(a). However, "[a] public employer shall have an affirmative defense to a civil action brought by a public employee under this subchapter if the adverse action taken against a public employee was due to employee misconduct [or] poor job performance . . . unrelated to a communication made pursuant to § 21-1-603." Ark. Code Ann. § 21-1-604(e)(1).

To prevail on a claim under the Act, a school-district employee must establish, by a preponderance of the evidence, that he suffered an adverse action because he engaged or intended to engage in an activity protected under the Act and that such action was unrelated to his own misconduct or poor job performance. *Hollis*, 2015 Ark. App. 544, at 14, 473 S.W.3d at 52. One of the prerequisites to bringing a claim under the Whistle-Blower Act is that an employee must communicate any alleged waste to an "appropriate authority." Section 21-1-602(2)(A) provides that an "appropriate authority" includes:

> (i)  A state, county, or municipal government department, agency, or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or

> (ii)  A member, officer, agent, investigator, auditor, representative or supervisory employee of the body, agency, or organization.

The employee's communication must be made at a time and in a manner which gives the public employer reasonable notice of need to correct the waste or violation. Ark. Code Ann. § 21-1-603(a)(2). The Act gives protection from adverse action against a public employee because the employee participates or gives information in an investigation, hearing, court proceeding, legislative or other inquiry, or in any form of administrative review. Ark. Code Ann. § 21-1-603(c).

Here, Plaintiff's whistle-blower claim fails for multiple reasons. First, for all the reasons argued earlier in the brief, Plaintiff did not suffer an adverse employment action because of his testimony in the federal desegregation trial in the summer of 2020. His whistle-blower claim therefore fails as a matter of law. Plaintiff did not report a violation of any law, rule, or regulation to an appropriate authority. Plaintiff was merely performing his job duties by telling the court about the two facilities in the District. In his testimony, Plaintiff did not report any new or independent violation of misconduct that would otherwise be unknown or would not be addressed without whistleblower intervention. He instead provided information regarding the facilities at

Mills High School and Robinson Middle School when PCSSD was already under judicial scrutiny as part of the longstanding desegregation case.  Plaintiff's role was to provide evidence on the unity-status issues in the case, not to report a new violation.  His testimony therefore does not fall within the scope of the AWBA.

## CONCLUSION

First, the District is entitled to summary judgment as a matter of law.  As established here, only those claims that are timely filed with the EEOC and properly exhausted through the administrative process may proceed in federal court. Plaintiff missed the 90-day deadline to file his Complaint.  Any alleged discrimination or unfair treatment that occurred before November 8, 2020, falls outside the actionable period.  Plaintiff did not file another EEOC charge after May 7, 2021.  Plaintiff has failed to exhaust his administrative remedies so his Title VII claims must be dismissed with prejudice.

Second, Plaintiff cannot establish a *prima facie* case of racial retaliation or discrimination under Title VII.  There is no similarly situated comparator who was treated more favorably. Testifying in a desegregation trial about school facilities is not a protected Title VII activity.  *See Warren v. Kemp*, 79 F.4th 967 (8th Cir. 2023).  The actions cited by Plaintiff like exclusion from meetings and lack of full staffing do not meet the legal standard for adverse employment action. Moreover, the evidence shows that the District's decisions were based on legitimate, nondiscriminatory reasons unrelated to race, and Plaintiff's pay grew during the period in question. Because Plaintiff did not engage in any protected activity, suffer an adverse employment action, or establish a causal connection between the two, summary judgment is appropriate.

Third, Plaintiff's AWBA claim fails as a matter of law. Plaintiff's testimony in the federal bench trial with Judge Marshall does not constitute a protected activity under the AWBA because it did not involve reporting a violation of any law, rule, or regulation. There is no evidence of any

adverse employment action taken against Plaintiff because of his testimony.  For these reasons, the District respectfully requests that this Court grant its motion for summary judgment and dismiss Plaintiff's whistle-blower claim with prejudice.  Alternatively, should this Court find that the whistleblower claim is not appropriate for summary judgment, the District respectfully requests that the Court remand the whistleblower claim to state court for further proceedings.

Respectfully submitted,

BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Phone: (501) 374-1107
Fax:    (501) 374-5092
Email: jbequette@bbpalaw.com
Email: ckees@bbpalaw.com
Email: pbrick@bbpalaw.com

By:_____**W. Cody Kees**_____
      Jay Bequette, Ark. Bar No. 87012
      W. Cody Kees, Ark. Bar No. 2012118
      Phillip M. Brick, Jr., Ark. Bar No. 2009116

*Attorneys for Defendant*