IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CURTIS A. JOHNSON                                                    PLAINTIFF

VS.                              CASE NO.  4:22-CV-0977 KGB

PULASKI COUNTY SPECIAL SCHOOL DISTRICT
A Public Body Corporate                                             DEFENDANT

| | |
|---|---|
| Austin Porter Jr., No. 86145<br>PORTER LAW FIRM<br>323 Center Street, Suite 1035<br>Little Rock, Arkansas 72201<br>Telephone: 501-244-8220<br>Facsimile: 501-372-5567<br>Email: Aporte5640@aol.com<br><br>Attorney for Plaintiff | Jay Bequette, No. 87012<br>Cody Kees, No. 2012118<br>BEQUETTE, BILLINGSLEY & KEES, P.A.<br>425 West Capitol Avenue<br>Little Rock, Arkansas 72201<br>Telephone: 501-374-1107<br>Facsimile: 501-374-5092<br>Email:  jbequette@bbpalaw.com<br>Email: ckees@bbpalaw.com<br><br>Attorney for Defendant |

PLAINTIFF'S BRIEF IN SUPPORT IN OPPOSITION
TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

ISSUES PRESENTED …………………………………………………..   iii

CONTROLLING AUTHORITY ……………………………………………   iv

INTRODUCTION ……………………………………………………….   1

STATEMENT OF FACTS ………………………………………………   1

STATEMENT OF LAW …………………………………………………..   8

CONCLUSION ………………………………………………………….   28

CERTIFICATE OF SERVICE …………………………………………..   28

# <u>ISSUES PRESENTED</u>

1.    WHETHER THE PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE THAT WILL ALLOW A REASONABLE FACT-FINDER TO CONCLUDE THAT HE WAS THE VICTIM OF DISPARATE TREATMENT BASED ON HIS RACE?

Plaintiff: Yes.
Defendant: No.

II.    WHETHER THE PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE THAT WILL ALLOW A REASONABLE FACT-FINDER TO CONCLUDE THAT THE DEFENDANT RETALIATED AGAINST HIM FOR COMPLAINING ABOUT DISCRIMINATION?

Plaintiff: Yes
Defendant: No

III    WHETHER THE PLAINTIFF'S TITLE VII CLAIMS ARE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS?

Plaintiff:  No.
Defendant: Yes

IV.    WHETHER THE PLAINIFF HAS STATED SUFFICIENT FACT TO SUPPORT A WHISTLE BLOWER CLAIM?

Plaintiff:  Yes
Defendant:  No

CONTROLLING AUTHORITY

CASES:                                                                                                                                                Page

*Adams d/b/a D. L. Adams Motors v. Hudspeth Motors, Inc.*, 587 S.W.2d 227

    (Ark.App. 1979) …………………………………………………..                               9

*Ballard v. Rubin*, 284 F.2d 235 (4th Cir. 1987) ……………………………………                27

*Bassett v. City of Minneapolis*, 211 F.2d 1097, 1099 (8th Cir. 2000) ……………….               10

*Bonilla v. Oakland Scavenger Co.*, 31 FEP 50, 53 (9th Cir. 1983) …………………..            16

*Burlington Northern & Santa Fe Railway Co. v. White*, No. 05-259, 2006 WL 1698953,

    at *11 (U. S. Supreme Ct., June 22, 2006) …………………………………….                   24

*DeAudra Bell v. Conopco, Inc.*, 186 F.3d 1099 (8th Cir. 1999) ……………………..              12

*EEOC v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003) …………………………………              26

*Favors v. Fisher*, 13 F.3d 1235 (8th Cir. 1994) ……………………………………..             14

*Fields v. Shelter Mutual Insurance Co.*, 520 F.3d 859 (8th Cir. 2008) ……………..           17

*Geraci v. Moody−Tottrup, International, Inc.*, 82 F.3d 578 (3rd Cir. 1996) ………..           14

*Green v. St. Louis Housing Authority*, 911 F.2d 65 (8th Cir. 1990) …………………               9

*Haas v. Weiner*, 765 F.2d 123 (8th Cir. 1985) ……………………………………                9

*Harrington v. Harris*, 108 F.3d 598 (5th Cir. 1997) …………………………………..           16

*Hendrickson, et al. v. Branstad, et al.*, 934 F.2d 158 (8th Cir. 1990) ……………..          22

*Holly v. Sanyo Mfg. Inc.*, 771 F.2d 1161, 1164 (8th Cir. 1985) …………………..             10

*Jessie v. Potter*, 516 F.3d 709, n. 2 (8th Cir. 2008) ………………………………..            27

*Johnson v. Arkansas State Police*, 10 F.3d 547 (8th Cir. 1993) ……………………             14

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997) ……………………………              15

*Kobrin v. University of Minnesota*, 34 F.3d 698 (8th Cir. 1994) ………………….              24

*Little Rock School District, et al. v. Pulaski County Special School District, et al.*

    17 F.3d 260 (8th Cir. 1994) …………………………………………………                 21

*Madewell v. Roberts*, 909 F.2d 1203 (8th Cir. 1990) ……………………………..             25

iv

CASES:                                                                                                    Page

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

      36 L.Ed.2d 668, 676 (1973) …………………………………………    13,15

*Medical Institute of Minnesota v. Nalts*, 817 F.2d 1310 (8th Cir. 1987) …………    9

*Ozark v. Milling Co., Inc. v. Allied Mills, Inc.*, 480 F.2d 1014 (8th Cir. 1973) …..    9

*Peterson v. Scott County*, 406 F.3d 515 (8th Cir. 2005)  ……….…………………    8, 10, 25

*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 120 S.Ct. 2097,

      147 L.Ed.2d 105 (2000) …………………………………………………    11

*Smith v. Riceland Foods, Inc*., 151 F.3d 813 (8th Cir. 1998) …………………………    25

*Robertson v. White*, 635 F.Supp. 851 (W.D. Ark. 1986) ………………………………    9,

*St. Louis v. Alverno College*, 744 F.2d 1314 (7th Cir. 1984) ………………………..    27

*Smith v. Riceland Foods, Inc.*, 151 F.3d 813 (8th Cir. 1998) ………………………...    18

*Smith v. URS Corporation*, 803 F.3d 964, 971-972 (8th Cir. 2015) …………………    19, 20

*Spears v. Missouri Department of Corrections and Human Resources*, 210 F.3d 850

      (8th Cir. April 28, 2000) …………………………………………………    25

*Strate v. Midwest Bankcenter, Inc.*,398 F.3d 1011 (8th Cir. 2005) …………………    12

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253,

      101 S.Ct. 1089, 67 L.Ed.2d 207, 215 (1981) …………………………    13

*Tolan v. Cotton*, 572 U.S. ___, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) ……...    9

*Torgerson v. City of Rochester*, 605 F.3d 584, 593 (8th Cir. 2010) ……………………    11

*Twin City Bank, et al. v. Verex Assurance, Inc.*, 733 F.Supp. 67 (E.D.Ark. 1990) ……    8

*Williams, et al. v. Miller, et al.*, 620 F.2d 199 (8th Cir. 1980) …………………………    21

*Young v. National Center for Health Services Research*, 828 F.2d 235 (4th Cir. 1987) .    27

STATUTES:                                                                                    Page

Title VII of the Civil Rights Act of 1964 (as amended) ………………………………    12

42 U.S.C. § 1981 …………………………………………………………………………    15

Whistle Blower Act (Ark. Code Ann. § 21-1-603) ……………………………………    23

<u>Introduction</u>

This is a civil rights action brought pursuant to Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C.S. § 1981 (as amended by the Civil Rights Act of 1991, which is codified at 28 U.S.C. § 1658), pursuant to 42 U.S.C. § 1983, pursuant to the Fourteenth Amendment to the United States Constitution and pursuant to the Arkansas Whistle-Blower Act (AWBA), as codified at Ark. Code Ann. § 21-1-601, *et seq*., in order to recover damages against the defendant for the unlawful discriminatory employment practices that the plaintiff, Curtis A. Johnson, has been subjected to on account of his race.  This is also an action for declaratory judgment pursuant to 28 U.S.C. § 2201 to declare the rights and other legal relations between the parties.  The plaintiff is seeking equitable relief and injunctive relief as well.  The defendant has filed a motion for summary judgment.  For the reasons stated herein, the court should deny the same.

<u>Statement of Facts</u>

The plaintiff Curtis Johnson III. is currently employed by the Pulaski County Special School District (PCSSD), where he has been employed since August 9, 2018.  Mr. Johnson is the Executive Director of Operations. (**See Deposition of Curtis Johnson attached herein as Plaintiff's Exhibit "A", p. 6**)[1].  Mr. Johnson oversees the day-to-day operations of plant planning, maintenance, security, transportation, which consists of twenty-two (22) buses, and the addition of the warehouse.  Mr. Johnson supervises some 600 people, and he had six or seven direct reports. (**Johnson Deseg. Depo, p. 7**).

Prior to working for the Pulaski County Special School District, Mr. Johnson was employed by Arkansas Baptist College, where he had worked for thirteen (13) years, as the Director of Operations.  Mr. Johnson worked for Arkansas Baptist College from 2006 until 2018.

---

[1] This deposition is from the desegregation case, taken on February 19, 2020, hereinafter referred to as (**Johnson Deseg. depo, p**.) Undersigned counsel deposed Mr. Johnson.

However, in 2013, Mr. Johnson had a break from his employment with Arkansas Baptist College, when he went to work for Morehouse College in Atlanta, Georgia, as the Chief of Police.  Mr. Johnson remained at Morehouse College until June 2014.  Mr. Johnson then came back to work for Arkansas Baptist College.  Mr. Johnson was at the time a certified police officer.  (**Johnson Deseg. Depo., p. 8**).

Mr. Johnson started his career as a police officer when he served as a military police officer for the Arkansas National Guard in 1985.  Mr. Johnson finished with the Arkansas National Guard in 1990, where he served as a military police officer for five (5) years and three months.  Mr. Johnson has worked between security, asset protection, law enforcement over the past  thirty (30) years.  Mr. Johnson graduated from the University of Arkansas, and received a master's degree from Webster's University, which he received in 2014.  (**Johnson's Deseg. Depo., p. 9-10**).

When Mr. Johnson started with the PCSSD in August 2018, his starting salary was $107,038, and he was placed on the paygrade 21 scale.  (**Defendant's Statement of Fact No. 2**).  Mr. Johnson's predecessor was Derek Scott.  Mr. Scott vacated his position as the Executive Director of Operations for the PCSSD in 2017.  (**Johnson's Deseg. Depo., pp. 11-12**).  Derek Scott is a white male.  (**Defendant's Statement of Fact No. 3**).  Derek Scott's contract for the 2015-2016 school year was $137,738.00, which is $30,000.00 more than Mr. Johnson's initial salary.

Dr. Janice Warren is an African American female who is employed by the Pulaski County Special School District.  (**See Deposition of Dr. Janice Warren attached herein as Plaintiff's Exhibit "B", p. 5**).  Dr. Warren was employed as the Assistant Superintendent for Equity and Pupil Services.  (**Warren's depo., p. 6**).  Dr. Warren, as the Assistant Superintendent for Equity and Pupil Services, was responsible for implementing *Plan 2000* on behalf of the Pulaski County

Special School District.  (**Warren's depo., p. 16**) (**See Plan 2000 attached herein as Plaintiff's Exhibit "C"**).   Dr. Warren became the Assistant Superintendent for Equity and Pupil Services in May 2013.   (**Warren's depo., p. 17**).   Dr. Warren was appointed to this position by then superintendent Dr. Jerry Guess.  (**Warren's depo., p. 18**).  Dr. Jerry Guess left the PCSSD on July 18, 2017, which is when Dr. Warren was appointed as the Interim Superintendent for the PCSSD.  (**Warren's depo., p. 19**).   Dr. Warren applied for the superintendent's position, but was not selected for the position.

In February 2022, the defendant school district was found to have committed unlawful employment practices against its Interim Superintendent – Dr. Janice Hargrove Warren, who is an African American female, in the case of *Janice Hargrove Warren v. Pulaski County Special School District*, United States District Court No. 4:19-CV-00655 BSM, when it failed to consider her for the vacant superintendent position that was awarded to a Caucasian male by the name of Dr. Charles McNulty.[2]

When Dr. Warren assumed the role of Interim Superintendent, she discovered that Derek Scott, who is a Caucasian male, and was employed as the Executive Director of Operations had diverted funds away from Mills High School, which was being constructed pursuant to Judge D. Price Marshall's orders, and said funds were being sent to the Robinson Middle School in the predominantly white area of Highway 10.  Mills High School is the sole high school that serves as the feeder pattern for the predominantly black communities of Sweet Home, Wrightsville, College Station, which are located in the Southeast sector of Pulaski County.  Dr. Warren found out that Derek Scott told the architects and contractors to reduce the square footage of the Mills High

---

[2] The jury awarded Dr. Warren $656,000.00.  However, this case was overturned on appeal when the Eighth Circuit ruled that Dr. Warren was not the victim of retaliation because she did not engaged in protected activity, because she had not complained about an employment practice.  <u>Warren v. Kemp, et al.,</u> 79 F.4th 967 (8th Cir. 2023).

School, so that the predominantly white school of Robinson Middle School could be bigger and built with superior materials. (**See Warren's depo., p. 143-147**).  Dr. Warren reported the actions of Derek Scott to district attorney Sam Jones, who was required to report these violations to Judge Price Marshall.  Dr. Warren stated that after the actions of Derek Scott in diverting funds from the Mills Project to the Robinson Middle School, he knew that he was finished.  When Dr. Warren became the interim superintendent in July 2017 after the departure of Dr. Jerry Guess, Scott just simply offered his resignation. (**Warren's depo., p. 145, lns. 14-22**).

In June 2020, Judge Marshall conducted a hearing to determine whether the Pulaski County Special School District had met its obligations under *Plan 2000*, allowing the district to be declared unitary, specifically in facilities.  Based in part on the testimony of Dr. Warren and Curtis Johnson, and the evidence adduced at trial, Judge Marshall ruled that PCSSD had not obtained unitary status in terms of facilities, due to the Mills High School construction being short changed.  See *Little Rock School District, et al. v. Pulaski County Special School District, et al*., United States District Court No. 4:82-CV-00866 DPM – [**Doc. # 5730**].

When Dr. Warren assumed the role of Interim Superintendent, she discovered that Derek Scott, who is a Caucasian male, and was employed as the Executive Director of Operations had diverted funds away from Mills High School, which was being constructed pursuant to Judge D. Price Marshall's orders, and said funds were being sent to the Robinson Middle School in the predominantly white area of Highway 10.  Mills High School is the sole high school that serves as the feeder pattern for the predominantly black communities of Sweet Home, Wrightsville, College Station, which are located in the Southeast sector of Pulaski County.  Dr. Warren found out that Derek Scott told the architects and contractors to reduce the square footage of the Mills High School, so that the predominantly white school of Robinson Middle School could be bigger and

built with superior materials. (**See Warren's depo., p. 143-147**).  Dr. Warren reported the actions

of Derek Scott to district attorney Sam Jones, who was required to report these violations to Judge

Price Marshall.  Dr. Warren stated that after the actions of Derek Scott in diverting funds from the

Mills Project to the Robinson Middle School, he knew that he was finished.  When Dr. Warren

became the interim superintendent in July 2018 after the departure of Dr. Jerry Guess, Scott just

simply offered his resignation. (**Warren's depo., p. 145, lns. 14-22**).

In June 2020, Judge Marshall conducted a hearing to determine whether the Pulaski County

Special School District had met its obligations under *Plan 2000*, allowing the district to be declared

unitary, specifically in facilities.  Based in part on the testimony of Dr. Warren and Curtis Johnson,

and the evidence adduced at trial, Judge Marshall ruled that PCSSD had not obtained unitary status

in terms of facilities, due to the Mills High School construction being short changed.  See *Little

Rock School District, et al. v. Pulaski County Special School District, et al.*, United States District

Court No. 4:82-CV-00866 DPM – [**Doc. # 5730**].   During this unitary status hearing, Mr. Johnson

offered truthful testimony about the construction quality of Robinson Middle School as compared

to that of Mills High School.  Mr. Johnson's testimony was detrimental to the PCSSD, which

resulted in the district found to be not in compliance with *Plan 2000*, resulting in the Court's

rejection of unitary status in the district's obligations to provide "equal" schools to the black

students of PCSSD.

Shortly after testifying in the unitary status trial, Mr. Johnson begin to experience

retaliation.  (**See Deposition of Curtis Johnson attached herein as Plaintiff's Exhibit "D", p.

65**).   Mr. Johnson was hired with an annual salary of $107,038.00, which was approximately

$30,000.00 less than his white predecessor – Derek Scott.  (**See Deposition of Curtis Johnson

attached herein as Plaintiff's Exhibit "D", p. 39**).  Mr. Johnson stated that his chief complaint

was that he was being paid less than Derek Scott, while at the same time having to perform the work of several people. Derek Scott had support staff that Mr. Johnson did not have. When Mr. Johnson started with the PCSSD, he did not have a Director of Safety and Security. Bennie Johnson served as the Director of Safety and Security, but he resigned. The PCSSD had also removed two (2) coordinator positions. Mr. Johnson was physically running the Safety and Security duties. (**Johnson's depo., p. 37**).

The Executive of Director of Operations has five departments: 1) Safety and Security, 2) Transportation, 3) Maintenance, 4) Planning, and 5) Warehouse. Mr. Johnson did not have two (2) director positions. When Mr. Johnson came to work for the district, he did not have a Director for Safety and Security, nor did he have a Director of Transportation. (**Johnson's depo., p. 38**). Mr. Johnson stated that based on the duties he was performing, and the district not having to hire a Director for Safety and Security and Director of Transportation, thus saving money, his salary should have been at least $175,000.00. (**Johnson's depo., pp. 40-41**). Mr. Johnson stated that he went to Dr. McNulty several times about filling the Director of Transportation position, but kept getting denied. (**Johnson's depo., p. 56**).

Mr. Johnson spoke with Dr. McNulty about his pay back in April 2023, but he told Mr. Johnson that he was not getting an increase in pay. (**Johnson's depo., p. 43**). However, in July 2023 McNulty decided to increase Mr. Johnson's salary to $145,397.00. (**Johnson's depo., p. 44**). By placing Mr. Johnson's salary at $145,397.00, it was placing him close to what Derek Scott made back in 2017. However, it took Mr. Johnson five (5) years to finally get some parity. (**Johnson's depo., p. 29-30, 39**). Dr. McNulty told Mr. Johnson that he was getting the increase in order to bring him up to where Derek Scott was paid back in 2017, when he resigned. (**Johnson's depo. p. 36**). Mr. Johnson stated that when he was hired back in August 2018 at $107,000.00, Dr.

McNulty acknowledged that Johnson's pay was low, and that they would revisit his salary the following year, but that did not happen.  It took four (4) years for the PCSSD to finally make the salary adjustment for Mr. Johnson.  (**Johnson's depo., pp. 31-32**).

Dr. Linda Remele was the president of the Pulaski County Special School District's Board of Education.  (**Johnson's depo., p. 73**).  Dr. Remele was extremely upset over the fact that Dr. Janice Warren had blown the whistle about the inequities that existed between the Robinson Middle School construction project and the Mills High School construction project.  When Dr. Warren fulfilled her obligation under *Plan 2000* by reporting the matter to Sam Jones, district attorney, he had to modify the facilities report and note the disparities that existed between the two (2) schools. (**See Plaintiff's Exhibit "E" – "*PCSSD's Supplemental Status Report for the September 8, 2017 Status Conference [Doc No. 5322]*."** )   Once Mr. Jones filed his amended facilities report, this matter was reported in the *Arkansas Democrat/Gazette*.  This angered Dr. Linda Remele, who chastised Dr. Warren by telling her "we don't air our dirty laundry in public." (**Warren's depo., p. 148**).

Shortly after testifying in the unitary status hearing during June 2020, Mr. Johnson began to experience retaliation from district officials.  (**Johnson's depo., p. 65**).  Mr. Johnson had been attending the mandatory monthly meetings consistently that were discussing *Plan 2000*, and how the district can come into compliance.  The meetings focused on student achievement, student discipline, monitoring, and facilities, four areas that the district needed to improve in order to be declared unitary.  (**Johnson's depo., p. 97**).  Mr. Johnson stated that he was informed by Dr. McNulty that he (Johnson) would no longer be attending the monthly court ordered meetings. Once he was told this by Dr. McNulty, he contacted the district's attorney Devin Bates to let him know that Johnson would not be attending the monthly meetings. (**Johnson's depo., p. 98**).

<u>Statement of Law</u>

The plaintiff filed his cause of action against the Pulaski County Special School District on October 7, 2022.  The plaintiff brings his cause of action against the defendant pursuant to Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 1981 (as amended by the Civil Rights Act of 1991, which is codified at 28 U.S.C. § 1658), pursuant to 42 U.S.C. § 1983, pursuant to the Fourteenth Amendment to the United States Constitution and pursuant to the Arkansas Whistle-Blower Act (AWBA), as codified at Ark. Code Ann. § 21-1-601, *et seq.*.  The plaintiff contends that he was the victim of discrimination based on his race, when the district paid him less than his white predecessor Derek Scott.   The plaintiff also contends that he was the victim of retaliation after testifying in court, he had duties and responsibilities taken away from him, such as not being able to participate in the tours conducted by the court, and not being allowed to attend the mandated monthly desegregation meetings.

A.     <u>Summary Judgment Standard</u>

Pursuant to Rule 56 of the Federal Rules of Civil (FRCP), a movant is entitled to an order granting summary judgment when there is no genuine issue as to any material fact.

> Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party.  The court must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party prevail as a matter of law.'

<u>Twin City Bank, et al. v. Verex Assurance, Inc</u>., 733 F.Supp. 67 (E.D.Ark. 1990), citing, <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  "On summary judgment the plaintiff need only present sufficient evidence to raise genuine doubt as to the legitimacy of the defendant's motives."  <u>Peterson v. Scott County</u>, 406 F.3d 515, 522 (8th Cir. 2005).

"Summary judgment should be 'cautiously invoked' so that no person will be improperly deprived of his Seventh Amendment right to a jury trial where there is no genuine issue as to any material fact." Robertson v. White, 635 F.Supp. 851, 870 (W.D. Ark. 1986).  The Eighth Circuit has also held that "a judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Medical Institute of Minnesota v. Nalts, 817 F.2d 1310 (8th Cir. 1987).

The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and any doubt should be resolved in favor of the party resisting the motion.  Ozark v. Milling Co., Inc. v. Allied Mills, Inc., 480 F.2d 1014 (8th Cir. 1973); see also, Tolan v. Cotton, 572 U.S.___, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  The courts have held that since summary judgment is such an extreme remedy, a motion for summary judgment should be granted "only if no genuine issue exists as to any material fact." Haas v. Weiner, 765 F.2d 123 (8th Cir. 1985).  "In deciding whether to grant a motion for summary judgment, the district court must view the evidence in favor of the party opposing the motion and give him the benefit of all reasonable inferences." Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990); Kegal v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986); Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1244 (8th Cir. 1991); Canada v. Union Electric Company, 135 F.3d 1211, 1212 (8th Cir. 1997).  Affidavits are not necessary to oppose a motion for summary judgment.  See Adams d/b/a D. L. Adams Motors v. Hudspeth Motors, Inc., 587 S.W.2d 227 72 (Ark.App. 1979).

> Fed.R.Civ.P. 56(c) provides that summary judgment shall be entered if the 'pleadings, depositions answers to interrogatories, and admissions on file together with the affidavits, *if any*, show that there is not a genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'

Green v. St. Louis Housing Authority, 911 F.2d 65, 68 (8th Cir. 1990) (emphasis added).

"Summary judgment should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion.  All the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the non-moving party."  Holly v. Sanyo Mfg. Inc., 771 F.2d 1161, 1164 (8th Cir. 1985).

The Courts have also held that "[s]ummary judgment should seldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.2d 1097, 1099 (8th Cir. 2000), *citing Smith v. St. Louis University*, 109 F.2d 1261, 1264 (8th Cir. 1997) (Arnold, R., C.J., Beam & Alsop, JJ.); *Keathley v. Ameritech Corp*., 187 F.3d 915, 919 (8th Cir. 1999) (Bowman, Heaney & Longstaff, JJ.); *Lynn v. Deaconess Med. Center West Campus*, 160 F.3d 484, 486 (8th Cir. 1998) (Arnold, R., Beam & Arnold, M., JJ.); *Helfer v. United Parcel Serv., Inc*., 115 F.3d 613, 615 (8th Cir. 1997) (Loken, Arnold, M. & Gunn, JJ.); *Bialas v. Greyhound Lines, Inc*. 59 F.3d 759, 762 (8th Cir. 1995)(Beam, Gipson & Murphy, JJ.0; *Oldham v. West*, 47 F.3d 985, 988 (8th Cir. 1995) (Hanson, Gibson, F. & Will, JJ.); *Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038, 1045 (8th Cir. 1994), (McMillian, Bright & Loken, JJ); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994)(Arnold, R., C. J. Wollman & Beam, JJ.); *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1244 (8th Cir. 1991) (McMillian, Fagg & Strom, JJ.); *Hillebrand v. M-Tran Industries, Inc.*, 827 F.2d 363, 364 (8th Cir. 1987)(Lay, C. J. Heaney & Larson, JJ.). "Summary judgment should seldom be granted in employment discrimination cases because intent is often the central issues and claims are often based on inference." Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005).

The Eighth Circuit cautioned against using summary judgment in discrimination cases. "Notably, we have repeatedly emphasized that 'summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent

is often difficult or impossible to obtain.'" <u>Torgerson v. City of Rochester</u>, 605 F.3d 584, 593 (8th

Cir. 2010), *quoting*, <u>Wallace v. DTG Operations, Inc</u>., 442 F.3d 1112, 11117 (8th Cir. 2006); *see*

*also*, <u>Peterson v. Scott County</u>, 406 F.3d 515, 520 (8th Cir. 2005)[3].  We have also cautioned that

summary judgment should not be granted in 'close' cases. '[T]he need to resolve factual issues in

close cases is the very reason we have juries.' <u>Torgerson</u>, 605 F.3d at 594, citing, <u>First National of</u>

<u>Omaha v. Three Dimension Systems Products, Inc.</u>, 289 F.3d 542, 545 (8th Cir. 2002); *see also*,

<u>Keho v. Anheuser-Busch, Inc</u>., 995 F.2d 117, 120 (8th Cir. 1993).

> [t]he court must draw all reasonable inferences in favor of the nonmoving party, and
> it may not make credibility determinations or weigh the evidence. *Lytle v. Household
> Mfg., Inc*., 494 U.S. 545, 554-555 (1990); *Liberty v. Lobby, Inc*., *supra*., at 254;
> *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6
> (1962). 'Credibility determinations, the weighing of the evidence, and all the drawing
> of legitimate inferences from the facts are jury functions, not those of a judge.' *Liberty
> Lobby*, *supra*, at 255. Thus, although the court should review the record as a whole, it
> must disregard all evidence favorable to the moving party that the jury is not required
> to believe. *See Wright & Miller 299.*  That is, the court should give credence to the
> evidence favoring the nonmovant as well as that 'evidence supporting the moving
> party that is uncontradicted and unimpeached, at least to the extent that evidence
> comes from disinterested witnesses.'

<u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105

(2000).

> Summary judgment is warranted when there remain no genuine issues of material fact
> and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  We
> review de novo the summary judgment record in light most favorable to Bell to
> determine whether or not a reasonable person could make inferences supporting
> plaintiff's claims.  *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1111 (8th Cir.
> 1995).  But neither the district court's function nor ours is to weigh evidence in the

---

[3] Undersigned counsel recognizes that the Eighth Circuit, in a deeply divided opinion (6-5), indicated that "[b]ecause summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed."  <u>Torgerson, et al. v. City of Rochester</u>, Eighth Circuit Court of Appeals, No. 09-1131 (June 1, 2011) (*en banc*) (emphasis added).  It is really not clear whether the Eighth Circuit reversed all of those opinions, or just criticized them.  Nevertheless, the practical effect of the "seldom be granted" language as espoused by the Eighth Circuit in *Bassett*, supra., and its progeny, in recent times has had no serious application, to benefit civil rights litigants.  *See* Clermont and Swab, *Employment Discrimination Plaintiffs In Federal Court: From Bad to Worse?*, 3 Harv. L. & Pol'y Rev. 1 (Winter 2009).

> summary judgment record to determine the truth of any factual issue; we merely determine whether there is evidence creating a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 249-51 (1986).   Because employment discrimination cases frequently turn on inferences rather than direct evidence, the court must be particularly deferential to the party opposing summary judgment.

DeAudra Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999) (emphasis added), *citing* Snow

v. Ridgeview Medical Center, 128 F.3d 1201, 1205 (8th Cir. 1997).

At the summary judgment stage, "[t]he controlling issue ordinarily is whether or not there exists a genuine issue of fact regarding any discriminatory motive." Strate v. Midwest Bankcenter, Inc.,398 F.3d 1011, 1017-1018 (8th Cir. 2005).  The Eighth Circuit further stated that, "[w]e have long recognized that a genuine issue of fact regarding unlawful employment discrimination may exist notwithstanding the plaintiff's inability to directly disprove the defendant's proffered reason for the adverse employment action." Strate, 398 F.3d at 1017, *citing* O'Bryan v. KTIV Television, 64 F.3d 1188, 1192 (8th Cir. 1995).

> [A] plaintiff bringing an employment discrimination claim may succeed in resisting a motion for summary judgment where the evidence, direct or circumstantial, establishes a genuine issue of fact regarding an unlawful motivation for the adverse employment action (i.e., a motivation based upon a protected characteristics), even though the plaintiff may not be able to create genuine doubt to the truthfulness of a different, yet lawful, motivation.

Strate, *supra*.

B.    Title VII of the Civil Rights Act

The Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e−2, makes it unlawful to discriminate against a person in the employment context.  The law states:

> It shall be an unlawful employment practice for an employer−

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; (2) to limit, segregate, or classify his employees or applicants for

employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national status.

"The language to Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, 676 (1973), *citing*, Griggs v. Duke Power Co., 401 U.S. 424, 429, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Chance v. Board of Examiners, 458 F.2d 1167 (2nd Cir. 1972); Quarles v. Phillip Morris, Inc., 279 F.Supp. 505 (E.D. Va. 1968).

Prima Facie Case

The plaintiff in a Title VII case has the initial burden of establishing a *prima facie* case of racial discrimination.  "The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207, 215 (1981).  A *prima facie* case of racial discrimination is demonstrated if the plaintiffs show the following:

(i)     that they belong to a racial minority;

(ii)    that they applied and were qualified for a job which the employer was seeking applicants;

(iii)   that, despite their qualifications, they were rejected; and

(iv)   that, after their rejection, the positions remained opened and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas Corp. v. Green, 36 L.Ed.2d at 677.

"The threshold of proof necessary to make a *prima facie* case is minimal . . . ." <u>Johnson v. Arkansas State Police</u>, 10 F.3d 547 (8th Cir. 1993), *citing* <u>Saint Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

> The *McDonnell Douglas−Burdine* burden-shifting framework was created because only rarely will a plaintiff have direct evidence of discrimination.  Gone are the days (if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disable or a member of certain race or religion.  To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that, once the plaintiff has shown the above elements, unlawful discrimination was the most likely reason for the adverse personnel action.  The elements of that prima facie case, however, must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination.

<u>Geraci v. Moody−Tottrup, International, Inc</u>., 82 F.3d 578, 581 (3rd Cir. 1996), *citing* <u>McDonnell Douglas</u>, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824 n. 13; <u>Torres v. Casio, Inc</u>., 42 F.3d 825, 830 (3rd Cir. 1994).

"The threshold of proof necessary to make a prima facie case is minimal . . ." <u>Johnson v. Arkansas State Police</u>, 10 F.3d 547 (8th Cir. 1993), *citing* <u>Saint Mary's Honor Center v. Hicks</u>, 509 U. S. ____, 125 L.Ed.2d 407, 113 S.Ct. ___ (1993).

> In the promotion context, Favors can establish a prima facie case of prohibited racial discrimination by showing (1) she belongs to a racial minority, (2) she applied and was qualified for a job for which GSA was seeking applicants, (3) despite her qualifications, she was rejected, and (4) after her rejection, GSA filled or sought to fill the position with persons of Favor's qualifications.

<u>Favors v. Fisher</u>, 13 F.3d 1235, 1237 (8th Cir. 1994).

    C.      <u>42 U.S.C. § 1981</u>

The plaintiff contends that he was denied the benefit of his employment contract with the defendant, as similarly situated white employees enjoyed.  The plaintiff brings this cause of action pursuant to 42 U.C.S. § 1981.  This statute provides that:

(a)    Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)    "Make and enforce contracts" defined

For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)    Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of law.

42 U.S.C. § 1981.

"The analysis to Title VII disparate treatment and 42 U.S.C. § 1981 claims in employment cases is the familiar three-part framework initially set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06, 93 S.Ct. 1817, 1823-26, 36 L.E.2d 668 (173), and further refined in Supreme Court cases, most recently *St. Mary's Honor Center v. Hicks*, 509 U.S. 52, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (Hicks) . . . The elements of a Title VII disparate treatment claim made and a § 1981 claim are identical."  *Kim v. Nash Finch Co*., 123 F.3d 1046, 1056 (8th Cir. 1997).  The court went on to say that "[l]ike the substantive claim of racial discrimination, a claim of retaliation, in a racial discrimination context, can violate both Title VII and 42 U.S.C. § 1981."  Kim v. Nash Finch Co., 123 F.3d 1046, 1056 (8th Cir. 1977), *citing*, *Setser v. Novack Investment Co*., 638 F.2d 1137, 1146-47 (8th Cir. 1981).

Disparate Treatment

In the case at bar, the plaintiff contends that he was treated differently on account of his race. The plaintiff contends that when he was hired for the position of Executive Director of Operations, he was being paid significantly less than his white predecessor, despite having to perform the duties of two (2) vacant director positions: a) Director of Safety and Security and b) Director of Transportation. (**Johnson's depo., p. 38**). Mr. Johnson had several conversations with Dr. McNulty about the pay disparity that existed between himself and Derek Scott. The plaintiff was hired in at a salary of $107,038.00 in 2018, when his predecessor was making $137,738.00 during the 2015-2016 school year, which is a $30,000.00 pay disparity. (**See Defendant's Exhibit 2 – Doc. No. 14-2**). Although Mr. Johnson was given a pay increase for the 2019-2020 school year bringing his salary to $130,052.00, his salary was still $7,686.00 less than Mr. Scott's 2015-2016 salary. It is apparent that Mr. Scott's salary for the 2019-2020 year would have certainly exceeded $140,000.00.

"A plaintiff may demonstrate pretext by showing that a discriminatory motive more than likely motivated the employer, or that the employer's explanation is unworthy of credence." Harrington v. Harris, 108 F.3d 598, 606 (5th Cir. 1997), *citing* Amburgey v. Cohart Refractories Corp., Inc., 936 F.2d 805, 813 (5ht Cir. 1991). "Disparate treatment arises when an employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. . . ." Bonilla v. Oakland Scavenger Co., 31 FEP 50, 53 (9th Cir. 1983), *quoting*, International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335-36 n. 15, 14 FEP Cases 1514 (1977).

In a race discrimination case, a plaintiff may survive a defendant's motion for summary judgment in one of two ways. The plaintiff may present admissible evidence directly indicating unlawful discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged

decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *Russell v. City of Kan. City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005). Alternatively, if the plaintiff lacks such evidence of discrimination, she may survive the defendant's motion for summary judgment by creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Fields v. Shelter Mutual Insurance Co., 520 F.3d 859, 863-864 (8th Cir. 2008).

Salary Disparity

When Curtis Johnson was hired by the PCSSD, his starting pay was $107,038.00, which was approximately $30,000.00 less than his white predecessor – Derek Scott. (**See Deposition of Curtis Johnson attached herein as Plaintiff's Exhibit "D", p. 39**). Mr. Johnson stated that his chief complaint was that he was being paid less than Derek Scott, while at the same time having to perform the work of several people. Derek Scott had support staff that Mr. Johnson did not have. When Mr. Johnson started with the PCSSD, he did not have a Director of Safety and Security. Bennie Johnson served as the Director of Safety and Security, but he resigned. The PCSSD had also removed two (2) coordinator positions. Mr. Johnson was physically running the Safety and Security duties. (**Johnson's depo., p. 37**).

Mr. Johnson was forced to perform more duties and responsibilities than his white predecessor Derek Scott. The Executive of Director of Operations has five departments: a) Safety and Security, b) Transportation, c) Maintenance, d) Planning, and e) Warehouse. Mr. Johnson did not have two (2) director positions. When Mr. Johnson came to work for the district, he did not have a Director for Safety and Security, nor did he have a Director of Transportation. (**Johnson's depo., p. 38**). Mr. Johnson stated that based on the duties he was performing, and the district no having to hire a Director for Safety and Security and Director of Transportation, thus saving money, his salary should have been at least $175,000.00. (**Johnson's depo., pp. 40-41**). Mr.

Johnson spoke with Dr. McNulty about his pay back in April 2023, but he told Mr. Johnson that he was not getting an increase in pay.  (**Johnson's depo., p. 43**).  However, in July 2023 McNulty decided to increase Mr. Johnson's salary to $145,397.00.  (**Johnson's depo., p. 44**).  By placing Mr. Johnson's salary at $145,397.00, it was placing him close to what Derek Scott made back in 2018.  However, it took Mr. Johnson five (5) years to finally get some parity.  (**Johnson's depo., p. 29-30, 39**).  Dr. McNulty told Mr. Johnson that he was getting the increase in order to bring him up to where Derek Scott was paid back in 2017, when he resigned. (**Johnson's depo. p. 36**).  Mr. Johnson stated that when he was hired  in August 2018 at $107,000.00, Dr. McNulty acknowledged that Johnson's pay was low, and that they would revisit his salary the following year, but that did not happen.  Mr. Johnson's salary was increased to $130,052.00 the next school year, once his credentials were verified by Human Resources, which is part of the district's hiring process and salary adjustment process.  (**See Affidavit of Curtis Johnson attached herein as Plaintiff's Exhibit "F"**).  Mr. Johnson was then given a salary increase to $137,284 for the school year of 2022-2023, which is what Derek Scott made in 2015.  In essence, Mr. Johnson's salary was still below what Mr. Scott would have been making had he stayed with the district. However, after several pleas to Dr. McNulty, and being forced to file a lawsuit in October 2022, Mr. Johnson's salary was finally increased to $145,397.00 effective during the 2022-2023 school year. (**See Defendant's Statement of Fact Nos. 15-16**).  It took four (4) years for the PCSSD to finally make the salary adjustment for Mr. Johnson, providing him with some type of parity for what it paid Mr. Scott.  (**Johnson's depo., pp. 31-32).**

In a similar case tried by undersigned counsel, Melvin Smith was employed by URS Corporation working as a S5.12 training specialist.  In November 2007, Mr. Smith applied for the S5.12 Training Specialist position, at a salary of $46,000.00 per year.  However, based on the

salary scale of URS, Mr. Smith was paid an annual salary of $57,668.00.  Five months later URS hired a Caucasian by the name of Jesse Griffin for the Training Specialist position, but placed his salary at $65,000.00.  Both Smith and Griffin held a bachelor's degree.[4]  Just two (2) months later URS hired Stanley Ellis, who is African American, for the S5.12 Training Specialist position, paying him the same as Smith - $57,668.00.  At the time of Mr. Ellis' hire, he possessed a Master's degree, and was just two (2) months from completing his doctorate.  When Mr. Smith discovered that Griffin was being paid seven thousand dollars more than Smith was being paid, he spoke with management about the matter, but was told that the owners would frown on his salary being brought up to Mr. Griffin's salary; he then filed a lawsuit against URS contending that he was subjected to disparate treatment on account of race – African American.  The district court granted the defendant's motion for summary judgment, finding that the defendant could not have been guilty of discrimination because the plaintiff got the position that he applied for.  Mr. Smith appealed.

The Eighth Circuit held that the district court applied the wrong standard.  In granting the defendant's motion for summary judgment, the district court judged the case on a failure-to-hire standard.

> As a preliminary matter, we note the district court applied the wrong legal analysis. This is not a failure-to-hire case, and the fact the employee was given the job he applied for does not mean he cannot make a disparate treatment claim.  The simple fact that a black man was awarded the job he applied for does not justify an employer treating similarly situated employees differently based upon their race.

Smith v. URS Corp., 803 F.3d 964, 969 (8th Cir. 2015).

---

[4] Although URS Human Resources Specialist had informed Mr. Griffin that he was being hired at the S5.12 position, a white manager (who previously was found to have discriminated against a black employee) placed him in the S5.13 position, which placed him on a higher pay scale.  *See* Dexter Duren v. Washington Group International, Inc. United States District Court No. 5:07-CV-00297 BSM.

The defendant also argued that how could Melvin Smith contend that he was a victim of discrimination, when he was actually paid more than the salary he requested.  Smith actually sought a salary of $46,000.00, but was paid $57,668.00.  However, the Eighth Circuit was not impressed.

In disparate treatment claims, the Eighth Circuit stated:

To meet her burden, a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently.

Smith v. URS Corp., 803 F.3d 964, 969, *quoting*, Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008); *see also* Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir.  2010).

Prevailing Party Status

Mr. Johnson filed his lawsuit against the district contending that he was being paid less than his white predecessor Derek Scott.  Again, this lawsuit was filed on October 7, 2022.  Mr. Johnson has partly accomplished what he set out to do when he filed his lawsuit, which was to bring some type of parity with his income.  However, he has not been made whole, because he has not gotten any type of back pay.   After having several discussions with Dr. McNulty about his salary, in July 2023 Dr. McNulty decided to increase Mr. Johnson's salary to $145,397.00. (**Johnson's depo., p. 44**).  By placing Mr. Johnson's salary at $145,397.00, it was placing him close to what Derek Scott made back in 2015.  However, it took Mr. Johnson five (5) years to finally get some parity.  (**Johnson's depo., p. 29-30, 39**).

The relief sought by plaintiffs was in substance achieved by voluntary compliance by the defendants after the suit was instituted, only after this compliance did plaintiffs dismiss the suit.  We have held that the fact a suit is mooted by voluntary actions of the defendants is not enough to prevent plaintiffs from being prevailing parties within the meaning of § 1988.  International Society for Krishna Consciousness, Inc. v. Anderson, 569 F.2d 1027 (6th Cir. 1978).  Similar results

have been reached under § 1617.  *See* <u>Davis v. Reed</u>, 72 F.R.D. 644 (D.C. Miss. 1976) (§ 1617 case resolve by consent decree.)

When defendants moot the suit by voluntary compliance the question becomes whether the suit was the 'catalyst' that brought about compliance by the defendants; if it was, the plaintiffs are prevailing parties for attorney's fees award purposes, despite the fact that judicial relief may no longer be necessary.  <u>Parham v. Southwestern Bell Telephone Co</u>, 433 F.2d 421, 429-30 (8th Cir. 1970) (suit under 42 U.S.C. § 2000e *et seq.*; application for attorney's fees under 42 US.C. § 2000e-5(k)); *see also* <u>NAACP v. Bell</u>, 448 F.Supp. 1164 (D.D.C. 1978) (suit under 42 U.S.C. §§ 1981 and 1985; application for attorney's fees under § 1988).  Although the district court has not passed on the question, the facts of this case suggest that the filing of this suit may well have served as the catalyst for the Board of Education's decision to expand its athletic program for girls, and that plaintiffs may therefore be prevailing parties for purposes of both § 1988.

<u>Williams, et al. v. Miller, et al</u>., 620 F.2d 199, 202 (8th Cir. 1980).

In another case, the court stated "[t]o determine whether the Joshuas were prevailing parties with respect to budget cuts, we inquire whether the orders the district court issued after the hearing gave the Joshuas a benefit they sought in bringing suit."  <u>Little Rock School District, et al. v. Pulaski County Special School District, et al</u>., 17 F.3d 260, 262-263 (8th Cir. 1994).

In the case at bar, the plaintiff's chief complaint was the fact that he was being paid less than his predecessor Derek Scott.  Mr. Scott made more than the plaintiff, despite the fact that Mr. Johnson was forced to assume the role of Director of Safety and Security and the role of Director of Transportation.  Mr. Scott was not required to fulfill these roles, because he had people to fill these positions.  Mr. Johnson stated that he constantly told Dr. McNulty that he needed to fill the above-mentioned directors' positions, but Dr. McNulty would not allow him to fill the positions.

(**Johnson's depo., p. 56**).

To determine whether a lawsuit was a catalyst which compelled a certain result, the suit must be a 'necessary and important factor in achieving the improvements,' and the result must be legally required as opposed to gratuitous or voluntary.  <u>United Handicapped Fed'n v. Andre</u>, 622 F.2d 342, 346 (8th Cir. 1980).  Hendrickson's lawsuit satisfies both criteria.  First, the lawsuit was a necessary element in achieving Iowa's compliance.  Prior to Hendrickson's lawsuit, Iowa was not

complying with the Act, and legislative action requiring compliance was not forthcoming. Indeed, legislative action complying with the Act did not occur until at least three years after commencement of Hendrickson's lawsuit, when necessitated by court order. Second, Iowa's compliance with the Juvenile Justice Act was not voluntary. The state's compliance was required by the district court's order that the state officials submit a plan to bring the state into compliance with the Act.

Hendrickson, et al. v. Branstad, et al., 934 F.2d 158, 161 (8th Cir. 1990).

The plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC) on May 7, 2021 stating that "I was paid less than my white predecessor with more responsibility. I was not allowed to hire the necessary management staff compared to my white predecessor." (**See Plaintiff's Exhibit "G"**). Despite the fact that the defendant received the plaintiff's Charge of Discrimination, this did not cause a change in the parties' position. When the plaintiff filed his Charge of Discrimination, his salary was $132,004.00.[5] (**See Defendant's Statement of Fact Nos. 13-14**). However, when Mr. Johnson filed his lawsuit on October 7, 2022, he received an annual increase of $5,200.00, bringing his salary to $137,284.00. The following year, the plaintiff's salary increased to $145,397.00, which was a $7,100.00 increase. It is obvious that the plaintiff's lawsuit was the catalyst for him finally getting some equity in his salary as compared to his predecessor. The defendant tries to justify the lower salary that the plaintiff was receiving as compared to Derek Scott due to the detachment of Jacksonville, which caused the plaintiff to have less responsibility. Nevertheless, the plaintiff's salary was finally brought to a comparable level of Mr. Scott.

---

[5] The plaintiff's salary was $132,004.00 for two (2) years.

Whistle Blower Act

The plaintiff contends that he was subjected to adverse employment action due providing truthful testimony during the unitary status trial that took place in June 2020 in violation of Arkansas Whistle-Blower Act, which is codified at Ark. Code Ann. § 21-1-603, *et seq.* .

(a)(1)   A public employer shall not take adverse action against a public employee because the public employee or a person authorized to act on behalf of the public employee communicates in good faith to an appropriate authority:

(A)      The existence of waste of public funds, property, or manpower, including Federal funds, property, or manpower administered or controlled by a public Employer; or

(B)      A violation or suspected violation of a law, rule, or regulation adopted under the Law of this state or a political subdivision of the state.

. . .

(c)      A public employer shall not take an adverse action against a public employee because the employee participates or gives information in an investigation, hearing, court proceeding, legislative or other inquiry, or in any form or administrative review.

After the plaintiff provided testimony during the unitary status hearing, he was demoted in status by having some of his duties and responsibilities taken away.  The plaintiff was not allowed to participate in the monthly desegregation meetings.  The plaintiff was not permitted to participate in the court order tours touring the facilities at Mills and Robinson Middle School.  This was an afront to the plaintiff because he serves as the Executive Director of Operations having responsibilities over the facilities.

Retaliation

After the plaintiff provided testimony during the unitary status hearing, he was demoted in status by having some of his duties and responsibilities taken away.  The plaintiff was not allowed to participate in the monthly desegregation meetings.  The plaintiff was not permitted to participate in the court order tours touring the facilities at Mills and Robinson Middle School.  This was an afront to the plaintiff because he serves as the Executive Director of Operations having responsibilities over the facilities.

"In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington Northern & Santa Fe Railway Co. v. White, No. 05-259, 2006 WL 1698953, at *11 (U. S. Supreme Ct., June 22, 2006), *citing* Rochon v. Gonzales, 438 F.3d 1211, 1213 (C.A.D.C. 2006), *quoting*, Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005).

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that adverse employment action occurred; and (3) a causal connection between the two." Kobrin v. University of Minnesota, 34 F.3d 698, 704 (8th Cir. 1994), *citing*, Jackson v. Missouri Pac. R.R., 803 F.2d 401, 406-07 (8th Cir. 1986) and Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).  The employer must then articulate a legitimate, nondiscriminatory reason for the adverse action, then the employee must be given an opportunity to show that the proffered reason was pretextual, and that their protected activity was the true reason. *See* Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998).  "This court has recognized the established rule that `an act in retaliation for the exercise of a constitutionally protected right is actionable

under Section 1983 even if the act, when taken for a different reason, would have been proper.'"

Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990).   "We emphasize that the alleged

manifestations of defendants' retaliation (such as less favorable treatment) need not themselves

amount to constitutional violations.  The violation lies in the **intent** to impede access to the courts."

Madewell v. Roberts, 909 F.2d 1203, 1206-1207 (8th Cir. 1990), *citing* Sanders v. St. Louis

County, 724 F.2d 665, 666 (8th Cir. 1983).

> To establish a prima facie case of retaliation, a plaintiff must show, among other
> things, that she suffered an adverse employment action at the hands of her
> employer.  *See Montando v. Farmland Industry, Inc.*, 116 F.3d 355, 359 (8th Cir.
> 1997).  An adverse employment action is a tangible change in working conditions
> that produces a material employment disadvantage.  *See Cossette v. Minn. Power
> & Light*, 188 F.3d 964, 972 (8th Cir. 1999).  Termination, reduction in pay or
> benefits, and changes in employment that significantly affect an employee's future
> career prospects meet this standard, *see Kerns v. Capital Graphics, Inc.*, 178 F.3d
> 1011, 1016 (8th Cir. 1999), but minor changes in working conditions that merely
> inconvenience an employee or alter an employee's work responsibilities do not, *see
> Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997).

Spears v. Missouri Department of Corrections and Human Resources, 210 F.3d 850, 853 (8th Cir.

April 28, 2000).

As soon as the plaintiff provided testimony during the June 2020 unitary status, he was

subjected to retaliatory conduct.  Mr. Johnson duties were diminished.  He was demoted in status,

by not being allowed to participate in the monthly desegregation meetings, and was taken off the

school tours.   "An inference of a causal connection between a charge of discrimination and

termination can be drawn from the timing of the two events, *Riceland*, 151 F.3d at 819-20; *Smith

v. St. Louis University*, 109 F.3d 1261, 1266 (8th Cir. 1997), but in general more than a temporal

connection is required to present a genuine factual issue on retaliation, *Kiel v. Select Artificials,

Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*)."  Peterson v. Scott County, et al., 406 F.3d

515, 524 (8th Cir. 2005).  The Eighth Circuit also said, "[b]ut this much is clear: temporal proximity

rises in significance the closer the adverse activity occurs to the protected activity.  The further in proximity the decision to terminate is from the protected activity, the less suspect the decision to terminate becomes." E.E.O.C. v. Kohler Co., 335 F.3d 766, 774 (8th Cir. 2003).

Statute of Limitations

The defendant contends that the plaintiff's Title VII claim is time barred, because it was brought more than ninety (90) days after the date of the Right-to-Sue letter, which is dated June 29, 2022.  The plaintiff filed his lawsuit on October 7, 2022, which is 100 days after the date of the right to sue letter.  On June 29, 2022 the plaintiff received a letter notifying him that the EEOC was closing his case.  The EEOC also advised the plaintiff that he would "[r]eceive an e-mail notification when the Dismissal and Notice of Rights has been uploaded into the Portal and available for you to download."  (**See Plaintiff's Exhibit "H"**).  On June 29, 2022, Tryone Blanks sent an email to Mr. Johnson informing him that the investigation into his complaint had been conducted, and that the Dismissal and Notice of Rights letter was attached to the email. On July 14, 2022, the plaintiff acknowledged that he received the letter of June 29, 2022 which indicated that the *Dismissal and Notice of Rights* letter will be sent by way of a separate email; however, the plaintiff let Mr. Blanks know that he never got the "Right to Sue" letter. (**See Plaintiff's Exhibit "I"**).  On July 14, 2022, Mr. Blanks responds by saying, "you should have received it in the mail. Nevertheless, here is a copy of the same."  (**See Plaintiff's Exhibit "J"**).

The defendant mainly argues that the plaintiff's complaint should be dismissed because the complaint was not filed within 90 days of the issuance of the "Dismissal and Notice of Rights" letter, commonly referred to as the right-to-sue letter, which was issued on March 28, 2018.  What the defendant fails to consider is that the law provides that the lawsuit must be filed within 90 days of the plaintiff *receiving* the right-to-sue letter.  *See* St. Louis v. Alverno College, 744 F.2d 1314,

1316 (7th Cir. 1984)[6], *citing* <u>Archie v. Chicago Truck Drivers Union</u>, 585 F.2d 210 (7th Cir. 1978). Pursuant to 42 U.S.C. § 2000e-(5)(f)(1), an action to enforce rights as secured by Title VII of the Civil Rights Act of 1964 (as amended), must be filed within 90 days of the plaintiff's *receipt* of the letter. <u>Williams v. Thompson Corp.</u>, 383 F.3d 789 (8th Cir. 2004). In the <u>Williams</u>, *supra*., case, the Equal Employment Opportunity Commission (EEOC), sent a letter to the plaintiff's last known address on June 17, 1999. Williams filed her suit against the defendants on October 21, 1999, which is 126 days after the letter was issued by the EEOC. The Court held that her claim was time barred.

Whether the plaintiff filed his lawsuit within the proscribed time is an affirmative defense that must be proved by the defendant. "The defendant has the burden of proving the affirmative defense of failure to exhaust administrative remedies." <u>Young v. National Center for Health Services Research</u>, 828 F.2d 235, 238 (4th Cir. 1987), *citing* <u>Brown v. Marsh</u>, 777 F.2d 8, 13 (D.C. Cir. 1985); *see also*, <u>Colbert v. Potter</u>, 471 F.3d 158, 165 (D.C. Cir. 2006). The Eighth Circuit has cited the ruling in *Colbert*, supra, with approval. See <u>Jessie v. Potter</u>, 516 F.3d 709, n.2 (8th Cir.2008). The Eighth Circuit has also cited with approval the ruling in *Young*, supra.. See <u>Ballard v. Rubin</u>, 284 F.3d 957, n. 6 (8th Cir. 2002). The defendant simply alleges that the Right-to-Sue letter was dated June 29, 2022, but provides no proof as to when the plaintiff actually received this letter. The plaintiff has provided proof that although the *Dismissal and Notice of Rights* letter was dated June 29, 2022, and was supposedly sent to him on said date, he has provided proof that the letter was not sent to him o said date. Therefore, the only proof that is in the record is that the *Dismissal and Notice of Rights* letter was finally sent to Mr. Johnson on July 14, 2022 when the

---

[6] The Court did not excuse the plaintiff's filing his Title VII action a year and a half after the EEOC issued the "Dismissal and Notice of Rights" letter, because the plaintiff failed to notify the EEOC of his change of address. The plaintiff contends that he did not receive the letter.

plaintiff informed Tyrone Blanks, who is employed by the EEOC, that Johnson did not receive the letter on June 20, 2022.

<u>CONCLUSION</u>

The plaintiff has presented sufficient evidence that will allow a reasonable fact-finder to conclude that he was the victim of disparate treatment on account of his race.  Also, in that the plaintiff was finally able to achieve an equitable salary, he has accomplished mainly what he set out to do when he filed his lawsuit, with the exception of back pay, which is an equitable remedy that the Court can rule on, as well as attorney's fees and costs.  In reference to the issue of failing to exhaust his administrative remedies, this is an affirmative defense that the defendant has failed to prove.  Therefore, the Court should deny the defendant's motion for summary judgment.

Respectfully submitted,

PORTER LAW FIRM
The Tower Building
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
Telephone: 501-244-8200
Facsimile: 501-372-5567
E-mail: Aporte5640@aol.com

By:     Austin Porter Jr.
          Austin Porter Jr., No. 86145

<u>**CERTIFICATE OF SERVICE**</u>

I, Austin Porter Jr., do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Eastern District of Arkansas - Central Division, on the 8th day of October 2024, using the CM/ECF system, which is designed to send notification of such filing to the following:

W. Cody Kees
BEQUETTE, BILLINGSLY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, Arkansas 72201-3469
Email: ckees@bbpalaw.com

                                        Austin Porter Jr.